1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ZINA STEAGALL,                    Case No. EDCV 16-00976 SS

12              Plaintiff,

13       v.

14  NANCY BERRYHILL,                  **MEMORANDUM DECISION AND ORDER**

15  Acting Commissioner of the
    Social Security Administration,

16
              Defendant.

17

18

19

20

21                          **I.**

22                      **INTRODUCTION**

23

24       Zina Steagall ("Plaintiff") brings this action seeking to

25  overturn the decision by the Commissioner of the Social Security

26  Administration (hereinafter the "Commissioner" or the "Agency")

27  denying her application for Supplemental Security Income ("SSI").

28  The parties consented, pursuant to 28 U.S.C. § 636, to the

jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on July 23, 2012. (Administrative Record ("AR") 166). The Agency initially denied Plaintiff's claim for SSI on November 7, 2012. (AR 197). Plaintiff filed a Request for Reconsideration. (AR 203). The Agency denied the request for reconsideration. (AR 204). Plaintiff filed a Request for Hearing by Administrative Law Judge on July 26, 2013. (AR 211). On April 18, 2014, Administrative Law Judge ("ALJ") Tamara Turner-Jones conducted a hearing to review Plaintiff's claim. (AR 28-44). On October 23, 2014, ALJ Dana McDonald conducted a supplemental hearing. (AR 45-56). On November 7, 2014, ALJ McDonald found that Plaintiff was not disabled. (AR 7, 22). Plaintiff sought review of the ALJ's decision before the Appeals Council on November 26, 2014. (AR 5). On April 18, 2016, the Appeals Council denied review. (AR 1-3). As such, the ALJ's decision became the final decision of the Commissioner. (AR 1). Plaintiff commenced the instant action on May 12, 2016. (Dkt. No. 1).

## A. **Plaintiff's History**

Plaintiff was born on July 13, 1967. (AR 20, 33). Plaintiff left school after completing the eleventh grade. (AR 876). Plaintiff worked as a hairstylist until 2007. (AR 508). At the April 2014 hearing, Plaintiff testified that she also previously worked in childcare, watching two young children for her sister-in-law. (AR 35-36). Plaintiff testified, however, that she stopped working because she heard voices telling her not to work. Plaintiff has not sought work since 2005 or 2006. (AR 36).

Medical records dated July 2, 2014 note that Plaintiff has seven children between the ages of 14 and 26. (AR 876). While Plaintiff testified to living with her daughters (AR 34), medical records state that she lives with one daughter, her sister, her sister's children, as well as several pets. (AR 876).

Plaintiff's May 17, 2013 medical records list "TANF, Food Stamps" under "Current Source of Income". (AR 508). Additionally, Plaintiff testified that she receives benefits for her minor children. (AR 38).

Medical records from the Riverside County Department of Mental Health, Alcohol and Drug Services, dated January 14, 2013 state that Plaintiff's mother denied that Plaintiff had any current or

past use of alcohol or street drugs. (AR 716). However, an Emergency Room Continuation of Care Report dated February 9, 2013 notes that Plaintiff "was brought in by Emergency Medical Services, secondary to doing PCP today" (AR 800) and that Plaintiff "stated she smoked some PCP and [] doesn't remember what happen[ed]." (AR 804). Medical records from this date also list "drug use" under "Past Medical History". (AR 803).

On May 17, 2013, Plaintiff denied substance abuse to consultative physician Dr. Paul Martin. However, Dr. Martin's comments state that "her behavior on exam certainly raises concerns regarding this area." (AR 507-508).

On August 5, 2013, an Emergency Room Continuation of Care Report notes that Plaintiff's "urine drugs screen" tested positive for PCP. (AR 774). Additionally, an August 10, 2013 Emergency Room Report notes PCP abuse under past medical history. (AR 766). This same report states that Plaintiff had been discharged from Menifee Valley Medical Center a few days prior with a diagnosis of "altered level of consciousness and delirium, secondary to PCP [] abuse." (AR 767).

On August 13, 2013, another Emergency Room Report states that Plaintiff came in complaining of severe pain and wanting pain medications, however had "slurred speech" and "was positive for PCP". (AR 763).

4

Mental health records from August 16, 2013 note that Plaintiff's landlord reported concerns about Plaintiff's well-being. Specifically, the landlord reported that she had recently seen Plaintiff and that she "could hardly talk and appeared to be under the influence of medications that made her look 'out of it'. [The Landlord] verbalized concern that [Plaintiff] was driving in this condition and that she also drove her two children this way as well." (AR 691). Case management records from January 2013 indicate that Plaintiff received a DUI while driving under the influence of her prescription medications. (AR 684).

On October 8, 2013, Plaintiff stated during an interview that she "'had just started using PCP this past year', but that she 'has been clean for x4 months.' Later, during the interview [Plaintiff] stated that she 'has been using [PCP] a long time.'" (AR 687). She further stated that she "hears voices ('not now, I took my meds') that tell her to use." (Id.). That same day, Plaintiff "stated that she has been clean and sober for x45 days from PCP" and expressed "how she feels she 'gets worse when using' and 'the voices tell her to do bad things, worse when on PCP.'" Plaintiff also denied auditory or visual hallucinations. However, she stated that she experiences hallucinations when not on her medication. (AR 688). Additionally, notes from Plaintiff's group mental health service on April 8, 2014 state that Plaintiff "checked into group, introduced herself, drug of choice as PCP". (AR 894).

Notes from Plaintiff's orthopedic consultation with Dr. Mario Luna on June 30, 2014 report, however, that Plaintiff "has never

5

used drugs". (AR 864). Likewise, on July 2, 2014, Plaintiff had a psychological evaluation with Dr. Kathy Vandenburgh. Under "Habits," Dr. Vandenburgh's report states that Plaintiff "denies a history of drug or alcohol abuse." (AR 877).

Under "Legal," this report also states that Plaintiff "reports a history of incarceration in prison for two years in 2003 due to trying to hurt somebody else." (Id.). Medical records from May 17, 2013 similarly state that plaintiff "acknowledged some involvement with the legal system, including serving a prison term, but she would not elaborate on the details." (AR 508).

Plaintiff's July 23, 2012 application for SSI alleged disability beginning on March 27, 2007 due to a variety of conditions, including asthma, hypertension, and severe carpal tunnel syndrome. (AR 166). Beginning in January 2013, Plaintiff sought mental health treatment and participated in group therapy. (AR 648-720, 891-898). Treatment notes indicate that Plaintiff exhibited restless motor activity, illogical thought processes, bizarre thought content, paranoid delusions, auditory and visual hallucinations, poor eye contact, irritability and a depressed mood. (AR 648-702). On February 20, 2013, Plaintiff received a diagnosis of "psychosis, NOS." (AR 675).

**B. Plaintiff's Testimony**

On April 18, 2014, Plaintiff testified about her work history, symptoms, and limitations in response to the ALJ's questions. (AR

32-43). Plaintiff testified that she could no longer work due to back pain, auditory hallucinations and difficulty being around others. (AR 42-43). In reference to her imaginary person, Plaintiff stated that "Susan tells me don't work. She doesn't want me to do anything. Susan just wants me all to herself and we sit there and we talk to each other and we talk to each other and those people and stuff in my head." (AR 42). She further stated that she does not "like to be around a lot of people. They put – Susan tells me to – she just wants me all to herself and she doesn't want me to be around a lot of people." (Id.).

Plaintiff testified about her daily living, stating that she could not do household chores. (AR 38). She testified that her mother and daughters help her to get dressed and take care of her personal hygiene needs. (AR 37-38). She testified that she goes to the grocery store once a month with her family. However, she does not walk around the store but, rather, sits in a "wheelie cart." (AR 39). She further testified that she watches TV "all day" and likes to lay down. (AR 39).

**C. Treating Physicians**

 **1. Niraj Gupta, M.D.**

Plaintiff had a mental health appointment with her treating physician, Dr. Niraj Gupta, on September 17, 2014. (AR 891-898). During this appointment, Dr. Gupta diagnosed Plaintiff with "Schizophrenia, Paranoid Type" and "Mental Retardation, Severity

Unspecified." (AR 896). Dr. Gupta completed a "Narrative Report" based on this appointment, noting that Plaintiff suffered from auditory and visual hallucinations, that delusions and paranoid thoughts influenced her actions or behavior, that she had a severe memory deficit and a moderate judgment deficit, that she was not able to complete a forty-hour work week without decompensating, and that her diagnosis was "chronic." (AR 895). Dr. Gupta also noted, however, that Plaintiff was able to manage her own funds in her best interest. (AR 895). At this appointment, Dr. Gupta provided a Global Assessment of Functioning ("GAF") score of 50 for Plaintiff, indicating that her mental impairment symptoms fell within the "serious" range of severity. (AR 896).

### 2. Marianne Tahl, M.D.

On October 10, 2011, Plaintiff's treating Physician, Dr. Marianne Tahl, wrote a letter on Plaintiff's behalf stating that Plaintiff was currently under her care and "may not return to work at this time." (AR 482). On March 15, 2013, Plaintiff called Dr. Tahl's office "requesting a letter stating she needs to be off work from January 2013 [until] . . . further notice." (AR 576). On March 29, 2013, Dr. Tahl wrote a letter on Plaintiff's behalf stating that she "may not return to work indefinitely as of 1/13/2013, due to a medical condition." (AR 862). On April 11, 2014, Dr. Tahl wrote a third letter stating that Plaintiff "may not return to work indefinitely as of 04/11/2014, due to a medical condition." (AR 861).

**D. Consultative Examinations**

   Plaintiff underwent two consultative psychological examinations, one in May 2013 and the other in July 2014. (AR 507-510, 875-879).

   **1.   Paul Martin, Ph.D.**

   On May 17, 2013, Dr. Paul Martin, a licensed psychologist, conducted a psychological evaluation of Plaintiff. (AR 507-510). Plaintiff was 45 years old on the date of the evaluation. (AR 507).

   Dr. Martin found that Plaintiff was "very unhelpful on interview, and appeared to be exaggerating the severity of her deficits.  Very little useful information could be obtained on interview.  She reported previously using mental health services, but could not provide details or describe her symptoms."  (AR 507). He further stated that Plaintiff "presented in a manner that raised concerns about her genuine effort versus exaggeration of symptoms." (Id.).

   Under the report topic entitled "Substance Abuse," Dr. Martin wrote:  "Denied.  However, her behavior on exam certainly raises concerns regarding this area."  (AR 508).  Under the report topic entitled "Forensic," Dr. Martin wrote:  "She acknowledged some involvement with the legal system, including serving a prison term, but she would not elaborate on the details."  (AR 508).

Dr. Martin noted deficits in attention, memory, fund of knowledge, calculations, abstractions, thought process, insight, and judgment. (AR 508). Dr. Martin administered the Weschler Adult Intelligence Scale (WAIS) IV, on which Plaintiff obtained a full scale IQ score of 40, indicating that her intellectual functioning was in the impaired range. (AR 509). However, Dr. Martin stated that the score was invalid because Plaintiff was "unable/unwilling to perform the simplest tasks." (Id.). Dr. Martin similarly administered the Weschler Memory Scale (WMS) IV, with Plaintiff's results indicating that her ability to learn and recall new information was in the impaired range. (Id.). Dr. Martin also considered these results invalid, noting that Plaintiff was malingering and that she had a GAF score of 70[1] (id.), indicating mild symptoms or difficulty functioning. In his assessment, Dr. Martin stated that "[d]ue to the unreliability of the claimant's self-reported history and level of functioning, it is presumed that her actual level of functioning is better than her self-reported level of functioning." (Id.).

Under the report topic entitled "General Observations," Dr. Martin stated that Plaintiff's "expressive and receptive language skills were adequate" and that her "gross motor function was

---

[1] A GAF score of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships (American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (DSM-IV-TR), 34 (2000)).

normal" and that she was "able to ambulate without assistance." (AR 508).

### 2. Kathy Vandenburgh, Ph.D.

On July 2, 2014, Dr. Kathy Vandenburgh, a psychologist, conducted a psychological evaluation of Plaintiff. (AR 875-883). Plaintiff was 46 years old on the date of the evaluation. (AR 876).

Under the report topic entitled "Habits," Dr. Vandenburgh wrote: "The [plaintiff] denies a history of drug or alcohol abuse." (AR 877). Under the report topic entitled "Legal," Dr. Vandenburgh wrote: "The [Plaintiff] reports a history of incarceration in prison for two years in 2003 due to trying to hurt somebody else. She reported, 'Susan hit someone with a screwdriver.' She denies ever being in trouble with the law since that time." (Id.).

Dr. Vandenburgh noted deficits in memory, attention, concentration, and fund of knowledge. (AR 877-878). Dr. Vandenburgh was unable to complete the WAIS-IV and WMS-IV because Plaintiff could not answer any questions correctly or remember any of the information. (AR 878). Dr. Vandenburgh noted that Plaintiff's "presentation was consistent with an individual who was feigning psychosis. She pretended to have an imaginary [friend] named Susan ... Her presentation clearly was not genuine." (AR 876). Dr. Vandenburgh further noted that Plaintiff could not answer simple questions that even those who have mild mental

11

retardation and psychosis are able to answer. (<u>Id.</u>). Dr. Vandenburgh stated that Plaintiff was "likely capable of handling funds" and that she "was clearly malingering." (AR 879).

Under the report topic entitled "Speech," Dr. Vandenburgh stated that Plaintiff's speech was normal, however she "was acting in a childlike manner, and her speech reflected this. The evaluator was able to understand 100% of the [plaintiff's] verbal productions. Tone was adequately modulated. Verbal response time was adequate." (AR 877).

**E. Adult Function Report**

On March 22, 2013, Plaintiff completed an Adult Function Report. (AR 366-374). Plaintiff alleged that she had difficulty understanding, completing tasks, concentrating, and following instructions, among other things. (AR 371). She further alleged that she could not pay bills, count change, or handle a savings account. (AR 369).

**F. Vocational Expert's Testimony**

Dr. Luis Mas, a vocational expert ("VE") testified at the October 23, 2014 hearing. (AR 49-54). The ALJ asked Dr. Mas to consider a series of factors in creating a hypothetical for determining Plaintiff's ability to work. (AR 50-52). The ALJ's hypothetical included a person with certain postural and environmental limitations. (AR 52). Dr. Mas testified that he

could identify work in the national economy that would be consistent with these limitations, including ticket taker, small parts assembler, sales attendant, and inspector/hand packager. (AR 52-53).

## IV.

### THE FIVE STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[2] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

---

[2]    Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1520, 416.910.

(1)  Is the claimant presently engaged in substantial
     gainful activity?  If so, the claimant is found
     not disabled.  If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the
     claimant is found not disabled.  If so, proceed to
     step three.

(3)  Does the claimant's impairment meet or equal one
     on the list of specific impairments described in
     20 C.F.R. Part 404, Subpart P, Appendix 1?  If so,
     the claimant is found disabled.  If not, proceed
     to step four.

(4)  Is the claimant capable of performing his past
     work?  If so, the claimant is found not disabled.
     If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not,
     the claimant is found disabled.  If so, the
     claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,
262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R.
§§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

On November 7, 2014, after employing the five-step sequential evaluation process, the ALJ issued a decision finding that Plaintiff is not disabled within the meaning of the Social Security Act. (AR 21).

At step one, the ALJ observed that Plaintiff had not engaged in substantial gainful activity since July 23, 2012, the date on which she filed an application for SSI. (AR 13).

At step two, the ALJ found that Plaintiff's severe impairments were obesity, lumbago, hypertension, chronic kidney disease, and sleep apnea. (Id.). The ALJ found, however, that Plaintiff's medically determinable mental impairment of psychosis was nonsevere. (Id.)

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (AR 15). At step four, the ALJ found that Plaintiff was "unable to perform any past relevant work." (AR 20).

Finally, at step five, the ALJ concluded that Plaintiff had the residual functioning capacity ("RFC") to "lift and/or carry 20 pounds occasionally and 10 pounds frequently; she can stand and/or walk for 6 hours in an 8-hour workday; she can sit for 6 hours in an 8-hour workday; she can push and pull within the weight limits; she cannot climb ladders, ropes, or scaffolds; she can frequently kneel, stoop, balance, crawl, and crouch; she can frequently handle, finger, and feel with the bilateral upper extremity; she should avoid even moderate exposure to fumes, odors, dust, gases,

or poor ventilation; and she should avoid even moderate exposure to hazards, such as machinery and heights." (AR 16).

The ALJ elaborated that, based on the testimony of the VE and considering Plaintiff's age, education, work experience, and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and, in sum, a finding of "not disabled" was appropriate. (AR 21).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. "The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." Auckland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F. 3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record

as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Auckland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff contends that the ALJ's decision should be reversed and remanded for further administrative proceedings or that immediate payment of benefits should be ordered. (Mtn. at 8). The Court disagrees. The ALJ's decision must be affirmed.

**A. The ALJ's Findings Regarding Plaintiff's Alleged Mental Impairment Do Not Require Remand**

Plaintiff complains that the ALJ erred at step two of the sequential evaluation process in holding that she has no severe mental impairments. (Mtn. at 4). Specifically, Plaintiff argues that her "well-documented psychotic symptoms, consistently low GAF scores, and the numerous resulting limitations identified by treating physician Dr. Gupta establish that her chronic psychosis would impose more than a minimal effect on her ability to do basic work activities." (Id.). It is unclear that any error occurred.

However, to the extent that the ALJ erred in assessing Plaintiff's alleged mental impairment, any error was harmless. First, the ALJ analyzed the alleged impairment according to the Regulations. Second, the jobs identified by the VE are applicable to someone with low level mental functioning. Thus, even if the ALJ had found Plaintiff's alleged mental impairment to be severe, the outcome here would be the same.

By its own terms, the evaluation at step two is a *de minimis* test intended to weed out the most minor of impairments. See <u>Bowen v. Yuckert</u>, 482 U.S. 137, 153-154 (1987); <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1158 (9th Cir.2005) (stating that the step two inquiry is a *de minimis* screening device to dispose of groundless claims) (quoting <u>Smolen, 80 F.3d at 1290).</u> An impairment is not severe only if the evidence establishes a slight abnormality that has only a minimal effect on an individual's ability to work. <u>Smolen</u>, 80 F.3d at 1290 (internal quotations and citations omitted). Here, the ALJ applied more than a *de minimis* test when she determined that Plaintiff's alleged mental impairment is not severe. However, the error was harmless.

"A decision of the ALJ will not be reversed for errors that are harmless." <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005). Moreover, in the Social Security context, the court "will not reverse for errors that are 'inconsequential to the ultimate nondisability determination.'" <u>Molina v. Astrue</u>, 674 F.3d 1104, 1117 (9th Cir. 2012) (quoting <u>Stout v. Comm'r</u>, 454 F.3d 1050, 1055 (9th Cir. 2006)). It is established that an ALJ's failure to find

an impairment severe, even if erroneous, is harmless error where at the later RFC stage of the analysis, the ALJ discusses the impairment, the medical findings, the pertinent symptoms, and the applicable opinions concerning functional limitations. Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007). At step two, the ALJ found that Plaintiff had no limitations in the four broad functional areas (the "paragraph B" criteria) set out in the disability Regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. (AR 13). Specifically, she found that Plaintiff had no limitations in activities of daily living, social functioning, concentration, persistence or pace, and no episodes of decompensation. (Id.).

Under the Regulations, after rating the degree of loss at step two, the ALJ must determine whether the plaintiff has a severe impairment. 20 C.F.R. § 416.920a(d). Once the ALJ has determined that a mental impairment is severe, the ALJ must then determine if it meets or equals a listing in 20 C.F.R. Part 404, Subpart P, Appendix I. 20 C.F.R. § 416.920a(d)(2). Finally, if a listing is not met, the ALJ must then assess the plaintiff's RFC, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the plaintiff's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described." 20 C.F.R. § 416.920a(d)(3), (e)(2).

Here, the ALJ explained that the RFC assessment "used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in broad categories found in paragraph B." (AR 14). The ALJ continued that, therefore, Plaintiff's RFC assessment "reflects the degree of limitation" found in the paragraph B mental function analysis (id.) and subsequently provided a thorough overview of Plaintiff's longitudinal mental health treatment records.

First, it is not clear that the ALJ erred when finding that Plaintiff's mental impairment was "not severe." The ALJ noted that one of the consultative examining physicians, Dr. Martin, assessed a GAF score of 70, indicating mild symptoms or difficulty functioning. (Id.). The ALJ also considered Dr. Gupta's opinion that Plaintiff could not complete a 40-hour work week without decompensating, but found it less persuasive because it contrasted sharply with the other evidence of record. (AR 15). The ALJ similarly considered the findings of both consultative examiners, who concluded that Plaintiff had "no mental limitations" despite mental status examinations revealing deficits with attention, memory, fund of knowledge, calculations, abstractions, thought processes, insight, judgment, and attention. (AR 14, 15). The ALJ also considered the fact that, in 2013, Plaintiff sought monetary assistance when she was unable to pay her rent. (AR 17, 689-690, 694). Medical records indicate that hospital staff instructed Plaintiff to have her landlord complete HHOPE rental assistance documents. (AR 694). Plaintiff responded that she "understood" and attempted to contact her landlord in an effort to

have these documents completed. (Id.). The ALJ determined that these facts were inconsistent with Plaintiff's Adult Function Report, wherein she claimed to have difficulty understanding, completing tasks, concentrating, following instructions (AR 17, 371), and claimed that she could not pay bills, handle a savings account, remember to take medications, or follow spoken instructions. (AR 17, 369). Thus, the ALJ fully considered Plaintiff's medical symptoms and the applicable opinions and evidence when determining Plaintiff's RFC and it is not clear that the ALJ erred by finding Plaintiff's mental impairment to be non-severe.

Moreover, while the ALJ did not incorporate Plaintiff's alleged mental impairment into the hypothetical that she posed to the VE, the jobs identified by the VE are capable of performance by someone with low level mental functioning. Thus, even had the ALJ fully credited Plaintiff's evidence, found a severe mental impairment, and incorporated the impairment into the hypothetical, the result would be the same. Specifically, the VE identified "[t]icket taker, DOT 344.667-010" and "[s]mall parts assembler", associated with DOT 739.687-030. (AR 21). Both of these jobs require a reasoning level of 2, meaning they require an ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions … [d]eal with problems involving a few concrete variables in or from standardized situations." APPENDIX C - COMPONENTS OF THE DEFINITION TRAILER, 1991 WL 688702. If the ALJ had found Plaintiff's mental impairment to be severe, these jobs would still be appropriate, particularly

in light of the ALJ's finding that Plaintiff could understand and follow instructions for the completion of rental assistance documents. (AR 17, 694). Thus, any error was harmless and remand is not required.

## B. **The ALJ Properly Considered The Treating Physicians' Opinions**

Plaintiff complains that the ALJ failed to properly consider Dr. Gupta's medical opinion (Mtn. at 4) as well as Dr. Tahl's letters. (Mtn. at 6). Plaintiff contends that the ALJ "failed to provide any specific and legitimate reasons" for rejecting these opinions. (Mtn. at 6, 8). Plaintiff asserts that both opinions must be accepted as a matter of law, resulting in a finding of disability, or in the alternative, remand. (Mtn. at 6, 8). The Court disagrees.

Although a treating physician's opinion is entitled to great deference, it is not necessarily conclusive as to either a physical condition or the ultimate issue of disability. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989). The ALJ may reject the opinion of a treating physician in favor of another conflicting medical opinion, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). Moreover, the ALJ "may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

### 1.  The ALJ Properly Considered Dr. Gupta's Opinion

The ALJ's decision contains a thorough summary of the medical evidence in the record.  (AR 13-20).  The ALJ considered Dr. Gupta's opinion that Plaintiff could not complete a 40-hour work week without decompensating. (AR 14).  The ALJ afforded greater weight, however, to the opinions of the two psychological consultative examiners who opined that Plaintiff has no mental limitations although mental status examinations showed deficits with memory, concentration, and fund of knowledge. (AR 15).  The ALJ appropriately set forth specific and legitimate reasons, based on substantial evidence in the record, for affording greater weight to these opinions.

The ALJ noted that, while Plaintiff complained of problems with memory, concentration, and mood swings and participated in group therapy for auditory hallucinations, she was not taking any psychotropic medications to control her mental symptoms.  (AR 14). Parra, 481 F.3d at 751 (finding evidence of "conservative treatment" as "sufficient to discount a claimant's testimony regarding severity of an impairment.")

The ALJ also weighed the fact that both psychological consultative reports found Plaintiff to be malingering. (AR 15). Further, the ALJ examined the reasons underlying Dr. Vandenburgh's opinion that Plaintiff was malingering, including that she could not answer simple questions that even those who have mild mental retardation and psychosis are able to answer, was unable to point

to body parts, could not correctly identify colors, was unable to count correctly from 1 to 10, and pretended to have an imaginary friend. (AR 15).

The ALJ similarly considered the fact that Plaintiff's alleged functional limitations were contradicted by medical records demonstrating that she was able to follow hospital instructions to have paperwork completed by her landlord in order to receive financial assistance for rent. (AR 17).

Thus, the ALJ carefully examined the record as a whole and articulated specific and legitimate reasons for finding that Dr. Gupta's opinion undermined by other evidence and was therefore less persuasive.

**2. The ALJ Properly Considered Dr. Tahl's Letters**

As with Dr. Gupta's opinion, the ALJ gave specific and legitimate reasons for affording little weight to Dr. Tahl's letters. Among other things, the ALJ cited to diagnostic studies which did not show more than mild-to-moderate findings associated with the chest/heart and abdomen, a lumbar spine X-ray that was unremarkable, and the fact that Plaintiff's chest, back, and abdominal pain were treated conservatively. (AR 17). The ALJ described the opinion of Dr. Mario Luna, M.D., Board eligible in orthopedic surgery, noting that it was consistent with objective findings. (AR 19). The ALJ also considered evidence in the record that, despite allegations of symptoms and limitations preventing

all work, Plaintiff planned to travel across the country for the holidays. (AR 17).

The ALJ properly considered Dr. Tahl's letters by providing a detailed summary of evidence contradicting these letters and by pointing to evidence that demonstrated Plaintiff had not been deprived of the ability to work. Thus, the ALJ appropriately discredited Dr. Tahl's conclusory statements, which were unsupported by the record as a whole. See Batson 359 F.3d at 1195.

## VIII.

## CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: May 16, 2017

_____
                /S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE